## A. G. CARVER v. NORMAN R. LYKES.

### (Filed 10 July 1964.)

**1. Malicious Prosecution § 2—**

In this jurisdiction actions for malicious prosecution may be based not only upon criminal prosecutions but also civil proceedings which involve an arrest of the person, seizure of property, or the loss of a legally protected right.

**2. Same—**

A real estate broker may maintain an action for malicious prosecution against a person who maliciously and without probable cause institutes proceedings before the Real Estate Licensing Board, which terminated in favor of the broker, charging conduct constituting ground for revocation or suspension of the broker's license. G.S. 93A-6.

**3. Malicious Prosecution § 13—**

Damages for malicious prosecution include loss of business, injury to reputation, mental suffering, and expenses reasonably necessary in defending the charge against plaintiff, together with any other loss proximately resulting from defendant's malicious prosecution, and, if actual malice is established, the jury may also allow punitive damages.

**4. Malicious Prosecution § 4—**

The right of action for malicious prosecution is based upon the malicious institution of a proceeding without probable cause, irrespective of any specific motive or purpose in instituting the proceeding, and therefore in an action for malicious prosecution based upon the institution of proceedings for the revocation of a real estate broker's license, an instruction to answer the issue whether defendant instituted the proceedings in the affirmative if the jury found that defendant filed the complaint with the licensing Board and did so for the purpose of revoking or suspending plaintiff's license, is erroneous.

**5. Pleadings § 29—**

The admission in the answer of the truth of the predicate facts of an issue establishes such facts, and therefore if the issue is submitted to the jury the court should instruct the jury to answer it in accordance with the admitted facts. G.S. 1-159.

**6. Brokers and Factors § 4—**

A real estate broker engaged to sell land for the owner owes the owner the duty to exercise reasonable care and diligence to effect a sale to the best advantage of the owner, which he cannot do without first determining the reasonable market value of the land, and the owner has the right to rely upon the broker's knowledge and advice without making an independent investigation.

**7. Same—**

Where the owner of land shows a substantial discrepancy between the price obtained by the broker and the market value of the property, the

owner may recover of the broker for the broker's negligence in failing to obtain an adequate price.

**8. Evidence § 58—**

In cross-examining a witness, counsel may not ask the witness, in the absence of actual proof as to the sales price, if the witness did not know that a certain individual sold his property for a stated sum, since the predicate facts in the question are not established by any evidence.

**9. Appeal and Error § 41—**

The admission of incompetent evidence over objection is rendered harmless by the admission of other evidence of the same import without objection.

**10. Brokers and Factors § 4—**

Evidence of prices paid by a power company for other lands in the vicinity is without probative force in establishing the fair market value of defendant's land when such other lands were not purchased on the open market but were acquired under threat of condemnation, and further when such other lands are dissimilar in size, condition, frontage on public highways, improvements, etc. Nor was it the duty of the broker to find out at what prices the power company had obtained such other properties.

**11. Same—**

Evidence tending to show that plaintiff broker, in selling to a power company, obtained the highest price the power company would pay without resorting to condemnation, and without evidence of any conflict in interest or bad faith on the part of the broker or evidence of any probative force that the price obtained for plaintiff's land from the power company was substantially less than the market value, is insufficient to be submitted to the jury on the owner's counterclaim against the broker for negligence of the broker in failing to exercise reasonable diligence to obtain the best price possible.

**12. Same—**

A broker may not be held liable by the owner for mere error of judgment in advising sale at a stipulated price, there being no evidence of bad faith on the part of the broker or that he had any interest in procuring a sale at less than the fair market value.

**13. Same—**

A contract of purchase and sale sent the purchaser with stipulation that the deposit made by the purchaser would be used to defray the expense of a survey if the purchaser did not take the property, *held* competent in evidence, even though not executed by the purchaser, to corroborate the purchaser's testimony that he did not agree to pay for the survey and to contradict the broker's testimony that he did.

**14. Same;   Vendor and Purchaser § 7—**

Where there is conflict as to whether the agreement of the purchaser to buy the tract in question was exclusive or inclusive of an encircling road, containing approximately two acres, shown on the map, it is error for the

court to instruct the jury in effect that the purchaser would be entitled to a return of his deposit upon the inability of the seller to tender an unencumbered title to the entire tract including the road.

APPEAL by plaintiff from *McLean, J.*, July 1963 Civil Session of BUNCOMBE.

Plaintiff, a resident of Asheville and licensed since 1937 as a real estate broker, instituted this action against the defendant to recover damages for an alleged malicious prosecution growing out of charges defendant filed against him with the North Carolina Real Estate Licensing Board which were dismissed by the Board after a hearing. Defendant admitted he filed the charges against plaintiff but denied all other material allegations in the complaint. He alleged two causes of action as counterclaims against the plaintiff: (1) that plaintiff had negligently failed to obtain an adequate price for land which he had engaged plaintiff to sell to the Carolina Power and Light Company; and (2) that plaintiff wrongfully retained five hundred dollars which defendant had deposited with him on the purchase price of other land, the title to which proved defective.

The evidence relating to plaintiff's cause of action and the defendant's two counterclaims was so intermingled at the trial that completely separate statements of each would be impossible without excessive repetition. The background of the case is this:

Defendant, a resident of Arizona, owned 13.2 acres in Buncombe County which he had purchased for $1,500.00 through the plaintiff broker in 1954. The Carolina Power and Light Company required this property, along with about sixty-five adjacent tracts totaling approximately twelve hundred acres, for the construction of a lake and a steam generating plant. Two realtors employed by the Power Company respectively appraised defendant's property at $5,280.00 and $6,-000.00 and, on December 13, 1960, it offered him $7,000.00 for his property. When defendant refused the offer, the Power Company instituted condemnation proceedings. Defendant thereupon telephoned plaintiff from Arizona and asked him to effect a satisfactory settlement with the Power Company if he could and, if he could not, to arrange with an attorney to represent him in the proceeding. In October 1960 the defendant had discussed with plaintiff his negotiations with the Power Company and had then asked him to be on the lookout for other property to replace his land which the Power Company was taking.

After receiving defendant's telephone call, plaintiff went on the land with the Power Company's two appraisers in an unsuccessful attempt

to have them increase their appraisal. Thereafter he had several conferences with the attorney for the Power Company following which it made a final offer of $9,900.00, or $750.00 an acre, for defendant's property. Plaintiff reported this offer to the defendant in Arizona and strongly recommended that he accept it. He told him that the Power Company would not pay more and, in his opinion, if defendant went to court he would ultimately lose money after paying an attorney's fee. As a result, defendant reluctantly authorized plaintiff to sell the property at $750.00 an acre without further investigation as to the "going rate" to the Power Company of property in the vicinity, although he was still of the opinion that he should receive more. He and his wife executed a deed to the Power Company which nonsuited the condemnation proceedings. Defendant paid plaintiff a five percent commission on this sale. Thereafter, defendant became dissatisfied with the price which plaintiff had obtained for him when he heard from his sister what other landowners had received for their property.

Plaintiff testified that he was thoroughly familiar with the defendant's land and knew the value of the property adjoining it. He had checked some of the sales which other landowners in the vicinity had made to the Power Company and, in his opinion, the defendant received more for his property than its actual market value. He also stated that he had no connection whatever with the Power Company and owned no stock in it.

Defendant testified that when he engaged plaintiff by telephone to continue his negotiations with the Power Company plaintiff said, "I will get top dollar for you," and defendant told him he thought his property was worth $2,000.00 an acre. After the sale he inquired whether plaintiff had investigated other sales to the Power Company in the vicinity of his land and plaintiff replied, "I didn't check them . . . I don't have to check it; I know what it is worth." On August 9, 1961 the defendant employed J. F. Gooch, a licensed real estate appraiser, to appraise the property he had sold. Gooch appraised it at $16,800.00, or approximately $1,300.00 an acre. Defendant stated that in his own opinion the property was worth between $1,600.00 and $2,-000.00 per acre.

In October 1960, as a prospective replacement for the property the Power Company was taking, plaintiff's employees had shown defendant a wooded hilltop containing approximately twelve acres in the D. E. Morgan subdivision known as Mountain Heights. The subdivision map showed this tract encircled by an unopened street. Neither Morgan nor plaintiff knew the actual location of the property but plaintiff pointed out its approximate boundaries to the defendant. All

parties understood that a survey would be required to locate both the twelve-acre tract and the street. Plaintiff testified: ". . . I sold him to begin with, this line here, the inside, and we estimated it at twelve acres." Defendant agreed to buy the property at $700.00 an acre and complete the sale when the Power Company paid him for his 13.2 acres. Mr. Morgan insisted that defendant put up a deposit of $500.00 to evidence his good faith.

Plaintiff's evidence with reference to defendant's second counterclaim is as follows: On one occasion, defendant wrote plaintiff that he had "been doing a lot of thinking about putting up that $500.00" because he would lose it if he did not take the property. On October 25, 1960 plaintiff wrote defendant that Morgan had asked for the deposit because the survey would cost around $500.00 and that he had turned the deposit over to him for that purpose although it was not customary to do this until a sale was consummated. Plaintiff enclosed with this letter a contract of purchase and sale for defendant to sign but he never did so. Plaintiff told defendant prior to the survey that if he took the property Morgan would pay for the survey and the entire deposit would be applied to the purchase price; otherwise, defendant would pay for the survey and lose that much of his deposit. The survey cost $451.00.

After the survey had been made, plaintiff went with defendant to the site and pointed out each stake to him. Defendant then said that he would take the property and that he also wanted the encircling street, making a total of 14.6 acres. Mr. Morgan agreed that defendant could have the street at the same price per acre. Defendant instructed plaintiff to have an attorney examine the title. The attorney passed the title to the twelve acres inside the road on July 22, 1961, but he refused to certify the title to the encircling road because, in his opinion, it had not been properly withdrawn from dedication. Thereafter, defendant used this as an excuse not to take the entire hilltop property and bought other land in Henderson County. On August 7, 1961 the plaintiff sent defendant a check for $49.00 which represented the difference between the cost of the survey and the deposit of $500.00. Defendant declined to cash the check.

Defendant's evidence with reference to his second counterclaim tended to show that in the beginning, as a result of plaintiff's representations, he thought the twelve-acre tract of the Morgan property as shown on the subdivision map "constituted a whole little mountain" and not just the hilltop. Plaintiff's employee did not inform him that the entire mountain contained seventy-five to one hundred acres. When he discovered that twelve acres embraced only the crest he became

"disinterested." Even so, after the survey he agreed to buy the twelve acres and the two acres in the encircling street, if the title to the tract was good. When the attorney refused to certify the title to the street, he decided that without those two additional acres he would not have the privacy he wanted, and he immediately notified plaintiff that he would not take the property.

After talking to the plaintiff on two occasions about how much more other landowners in the vicinity had received from the Power Company for their property than he, defendant made a third visit to plaintiff's office to demand the return of his $500.00 deposit on the land. Then, for the first time, plaintiff informed him that he was to pay for the survey whether or not he bought the property. Defendant told him that he had never agreed to pay for the survey and this was not his understanding.

On November 16, 1961, defendant filed with the Real Estate Licensing Board two verified complaints which charged, in effect, (1) that by reason of gross negligence or a conflict of interest, plaintiff had misrepresented to defendant the value of lands he had authorized him to sell to the Power Company and had "lied" to him about his prospects of getting more money for the property in a condemnation proceeding than in a voluntary sale; (2) that plaintiff misrepresented the acreage in the Morgan tract of land which he was trying to sell to defendant; and (3) that plaintiff had refused to return defendant's five hundred dollar deposit when defendant "could not get a guaranteed title on the property as surveyed," and that plaintiff had lied to him about the matter. (Enumeration ours.)

On December 5, 1961 the Board notified plaintiff of the charges defendant had filed against him and that, as a result of the charges, a hearing would be held on January 26, 1962 to determine whether his real estate broker's license should be revoked or suspended under the provisions of G.S. 93A-6. At defendant's request, and over the plaintiff's objection, the matter was continued until June 29, 1962 at which time a public hearing was held in the Buncombe County Courthouse in Asheville.

At the trial plaintiff offered in evidence a transcript of defendant's testimony at the hearing. According to the transcript, defendant had testified that although he had no proof of it, he had heard that plaintiff owned "quite a bit of stock in the Carolina Power & Light Company"; that the rumor made him very suspicious and he was charging him with a conflict of interest. He also said that plaintiff knew he could not buy the Morgan property until the Power Company had paid him for the 13.2 acres and that plaintiff was more anxious to effect a sale

for his friend Morgan than he was to get "top dollar" for defendant from the Power Company.

The transcript further showed that at the hearing defendant withdrew any charge that plaintiff had *intentionally* misrepresented the Morgan property to him. With reference to the survey of that property he testified: "He (Morgan) wanted it surveyed in order to sell it to me, and if I had not contracted to purchase it, he would not have had it surveyed. I expected him to pay the survey bill of $451. I didn't buy the property because it was misrepresented to me was my reason and that was incidental, it didn't meet my needs."

At the hearing before the Board plaintiff was represented by counsel; defendant was not. After considering the evidence offered by the defendant, the Board granted plaintiff's motion to dismiss the defendant's charges against him.

During the trial, over plaintiff's general objection, defendant's counsel read to the jury a portion of the unsigned contract which accompanied plaintiff's letter to the defendant of October 25, 1960. It provided that the Morgan land to be conveyed to the defendant should be "surveyed with the outside of said street and to be sold on an acreage basis. Said survey to be made by the parties of the first part (the Morgans) and to be paid for by the parties of the first part." Without objection, this further provision was read to the jury: "It is further understood and agreed that parties of the first part will deed to the party of the second part the land above described, with a good and warranty title, free and clear of all encumbrances except 1962 taxes. . . . (I)f, for any reason, the party of the second part fails to perform strictly in accordance with the above contract, the said Five Hundred Dollars ($500.00) shall be forfeited as liquidated damages and this contract shall become null and void."

Ten issues were submitted to the jury which denied any recovery to the plaintiff and awarded defendant $2,500.00 in damages on his first counterclaim and $500.00 on his second. From judgment entered on the verdict the plaintiff appealed.

*Harold K. Bennett and Don C. Young for plaintiff.*
*Redden, Redden & Redden for defendant.*

SHARP, J.

(1) *Plaintiff's Action.*

The common law action for malicious prosecution was originated as a remedy for unjustifiable criminal prosecutions. However, in North Carolina and many other states, the right of action has been extended

to include the malicious institution of civil proceedings which involve an arrest of the person or seizure of property or which result in some special damage. *Ely v. Davis,* 111 N.C. 24, 15 S.E. 878; *Jerome v. Shaw,* 172 N.C. 862, 90 S.E. 764; *Estates v. Bank,* 171 N.C. 579, 88 S.E. 783 (*lis pendens*); *Nassif v. Goodman,* 203 N.C. 451, 166 S.E. 308 (Involuntary bankruptcy); *Brown v. Estates Corp.,* 239 N.C. 595, 80 S.E. 2d 645 (Malicious and wrongful attachment); 3 Strong, N. C. Index, *Malicious Prosecution* § 2.

The weight of authority in this country now supports the view that, under certain circumstances, an action for malicious prosecution may be predicated upon the prosecution, institution, or instigation of an administrative proceeding where such proceeding is adjudicatory in nature and may adversely affect a legally protected interest. *National Surety Co. v. Page,* 58 F. 2d 145 (4th Cir. 1932); *Melvin v. Pence,* 130 F. 2d 423 (D.C. Cir.); 143 A.L.R. 149; Restatement, *Torts* § 680 (1938); 34 Am. Jur., *Malicious Prosecution* § 19.1 (Supp. 1963); Prosser, *Torts* § 99 (1955); See also *Toft v. Ketchum,* 18 N.J. 280, 113 A. 2d 671, 673.

In *Melvin v. Pence, supra, Rutledge, J.,* pointed out:

". . . Much of the jurisdiction formerly residing in the courts has been transferred to administrative tribunals, and much new jurisdiction involving private rights and penal consequences has been vested in them. In a broad sense their creation involves the emergence of a new system of courts, not less significant than the evolution of chancery. The same harmful consequences may flow from the groundless and malicious institution of proceedings in them as does from judicial proceedings similarly begun. When one's livelihood depends upon a public license, it makes little difference to him whether it is taken away by a court or by an administrative body or official. Nor should his right to redress the injury depend upon the technical form of the proceeding by which it is inflicted. The administrative process is also a legal process, and its abuse in the same way with the same injury should receive the same penalty."

It follows that one who instigates or procures investigatory proceedings against another before an administrative board which has the power to suspend or revoke that other's license to do business or practice his profession, is liable for the resulting damage if (1) the proceeding was instituted maliciously; (2) without probable cause; and (3) has terminated in favor of the person against whom it was initiated. In such a suit for malicious prosecution the plaintiff may recover

for any resulting loss of business, injury to reputation, mental suffering, expenses reasonably necessary to defend himself against the charge, and any other loss which proximately resulted from the defendant's wrongful action. If actual malice is established the jury may allow punitive damages. *Brown v. Estates Corp., supra; Pressley v. Audette,* 206 N.C. 352, 173 S.E. 905; *Newton v. McGowan,* 256 N.C. 421, 124 S.E. 2d 142.

G.S. 93A-1 makes it unlawful for any person to act as a real estate salesman or broker without first obtaining a license from the North Carolina Real Estate Licensing Board. G.S. 93A-6 empowers the Board to suspend or revoke such license for such misconduct as therein specified. It also provides that upon the filing of a written, verified complaint which makes out a *prima facie* case of such misconduct, the Board *shall,* after due notice, hold a hearing and investigate the actions of the realtor whose conduct has been called into question.

Of course, before a defendant can be held liable in any action for malicious prosecution it must appear that he prosecuted, instituted, or instigated the administrative proceeding of which the plaintiff complains. This fact, unless admitted, must be established by the first issue. In the trial below the jury disposed of plaintiff's action by a negative answer to the first issue which was stated: "Did the defendant institute and prosecute an action before the North Carolina Real Estate Licensing Board against the plaintiff to revoke or suspend his Broker's Real Estate License, as alleged in the Complaint?" With reference to this issue the court charged the jury as follows:

> "So the Court instructs you, members of the jury, that if you find from this evidence and by its greater weight, that the defendant did file with the Board the complaints in question, and *that at the time he did so that he did so for the purpose of revoking the license, revoke or suspend the broker's or real estate license of the plaintiff,* Mr. Carver, then it would be your duty to answer this first issue YES. If you do not so find, you will answer it NO, or, if upon a fair and impartial consideration of all the facts and circumstances in the case, if you find the evidence of equal weight, you will answer it NO." (Italics ours).

The plaintiff's assignment of error to the foregoing portion of the charge must be sustained. The defendant testified that in filing the charges it was never his purpose to cause a revocation of plaintiff's license; that he was merely "bringing to the attention of the Board what Mr. Carver had done" to him. However, the charges filed by defendant required the Board to investigate the plaintiff's conduct and,

if found to be true, they constituted grounds for the revocation of his license under G.S. 93A-6. Having thus invoked the statute, the defendant may no more say that in filing the complaint it was not his purpose to jeopardize the plaintiff's license than a defendant in any ordinary malicious prosecution action would be heard to say that in swearing out a warrant it was not his purpose to convict the person he had charged with crime. "The instigation of an administrative proceeding is sufficient where the institution of the proceeding actually follows from it." 34 Am. Jur., *Malicious Prosecution* § 19.1 (Supp. 1963). Moreover, the defendant's motive or purpose in instituting the proceedings in question is not material on the first issue. The defendant admitted in his answer that he filed with the Board the written, verified charges against the plaintiff which are set out in paragraphs 6 and 7 of the plaintiff's complaint. The only question rightly involved on the first issue was whether defendant instituted the proceedings of which plaintiff complained — not whether he intended to cause the revocation or suspension of plaintiff's license by so doing. In this case plaintiff's instigation of the proceedings is not an issue. His admission in the answer established that he had done so. G.S. 1-159; *Davis v. Rigsby,* 261 N.C. 684, 136 S.E. 2d 33; *Fairmont School v. Bevis,* 210 N.C. 50, 185 S.E. 463. The first issue in this case, if submitted, should have been answered YES by the court. For the error in the charge with reference to it there must be a new trial.

(2)  *Defendant's First Counterclaim.*

Plaintiff's thirtieth assignment of error is to the failure of the court to sustain his motion for judgment as of nonsuit as to defendant's first counterclaim. In defendant's words at the trial, the basis of his first counterclaim was that plaintiff "was grossly negligent because he didn't go around to the neighbors and find out either what was offered by the Carolina Power and Light Company for the property or what transactions had taken place and actually what prices" neighboring property brought.

> "A real estate agent with whom property is listed for sale or exchange acts in a fiduciary capacity, if he accepts the proffered employment. It is his duty to obtain for his principal the largest price possible, or in case of an exchange the most advantageous trade." *Devine v. Hudgins,* 131 Me. 353, 163 A. 83.

The duty which a real estate broker engaged to sell land owes to his principal is stated in 12 Am. Jur. 2d, *Brokers* § 96 as follows:

> "As a general rule, a broker who is not a mere middleman, but is employed by a principal to act as his agent in a transaction, is

bound to exercise reasonable care and skill, or the care and skill ordinarily possessed and used by other persons employed in a similar undertaking. He must exert himself with reasonable diligence in his principal's behalf, and is bound to obtain for the latter the most advantageous bargain possible under the circumstances of the particular situation. Thus, a broker employed to sell property has the specific duty of exercising reasonable care and diligence to effect a sale to the best advantage of the principal — that is, on the best terms and at the best price possible." See also Annot., Liability of real-estate broker to principal for negligence in carrying out agency, 94 A.L.R. 2d 468; 12 C.J.S., *Brokers* § 26.

It was, as defendant contends, the plaintiff's duty to determine the reasonable market value of defendant's property before attempting to effect a sale of it and, under the circumstances, he had the right to rely upon plaintiff's knowledge and advice without making an independent investigation himself. In cases involving real estate brokers, where the negligence of the broker in obtaining an adequate price is set up, either as the basis for a cause of action in tort against him or as a defense to his action to recover a commission, courts have ruled in favor of the property owners where there was evidence of a substantial variation in the real value of the property and that obtained by the broker. *Smith v. Carroll Realty Co.*, 8 Utah 2d 356, 335 P. 2d 67; *Russell Grain Co. v. Bainter*, Kan., 223 S.W. 769; *Stuart v. Stumph*, 126 Ind. 580, 26 N.E. 553; *Myers v. Adler*, 188 Mo. App. 607, 176 S.W. 538.

To show a substantial variation in the real market value of defendant's 13.2 acres and the price obtained by the plaintiff, plaintiff was asked on cross-examination, over the objection and exception of his counsel and without any foundation whatever having been laid for the questions, if he did not know that the Power Company had paid Dan Moody $1,375.00 an acre for property in the vicinity of defendant's; Meece, Buckner, Swicegood, and Butler, $1,200.00 an acre; and Austin, $800.00 for one-half an acre. Plaintiff replied that he had no such knowledge. Thereafter, on the direct examination of other witnesses for defendant, evidence that the aforementioned individuals had received the stated sums per acre was admitted without objection along with evidence as to the price paid by the Power Company to a number of other individuals for tracts, or parts of tracts in the project area, ranging in size from one-half an acre to four hundred acres. The prices per acre varied from less than $500.00 to more than $4,000.00. Some of the tracts contained one or more dwellings or improvements of various kinds. Some fronted on the public highway. All apparently were substantially dissimilar in either size, condition, location, or im-

provements to the defendant's property, which had no frontage on a public road and no buildings of any kind on it. It was subject to rights of way for both telephone and electric power lines running north and south across the middle of the property.

Under the rule laid down in *Barnes v. Highway Commission,* 250 N.C. 378, 394, 109 S.E. 2d 219, and most recently restated in *Highway Commission v. Coggins,* 262 N.C. 25, 136 S.E. 2d 265, this evidence was clearly incompetent to establish the value of defendant's land. In the first place, all of the sales to the Power Company were made under the threat of condemnation and were forced rather than voluntary sales. *Highway Commission v. Pearce,* 261 N.C. 760, 762, 136 S.E. 2d 71. Their sales prices were not, therefore, a fair indication of market value.

> ". . . (E)vidence of amounts paid by the condemnor for property similarly situated, in the absence of extraordinary circumstances, is inadmissible, because such sales are involuntary and therefore, under the substantive law, run counter to the essential ingredient of fair market value. . . ." II Wigmore on Evidence, (3d ed.) § 463 (Supp. 1962).

Secondly, the judge heard no evidence in the absence of the jury or otherwise made any attempt to determine whether there was a sufficient similarity between the properties to render such evidence competent. So far as the record discloses, proximity of location and the Power Company's requirement of the properties constituted the only similarity between defendant's land and those with which he attempted to compare its value. Furthermore, it was also error to permit the cross-examination of plaintiff by such questions as "Do you know he (Moody) sold two acres to Carolina Power and Light Company for $1,375.00 an acre?" The "utmost freedom of cross-examination" to test a witness' knowledge of values, mentioned in *Barnes v. Highway Commission, supra,* does not mean that counsel may ask the witness if he doesn't know that a certain individual sold his property for a stated sum with no proof of the actual sales price other than the implication in his question. *Bennett v. R. R.,* 170 N.C. 389, 87 S.E. 133, 16D L.R.A. 1074. Where such information is material it is easy enough to establish by the witness himself, whether a certain property has been sold to his knowledge and, if so, whether he knows the price. If he says he does not know, his lack of knowledge is thus established by his own testimony and doubt is cast on the value of his opinion. *Highway Commission v. Privett,* 246 N.C. 501, 506, 99 S.E. 2d 61. If he asserts his knowledge of the sale and, in response to the cross-examiner's ques-

tion, states a totally erroneous sales price, is the adverse party bound by the answer or may he call witnesses to establish the true purchase price? Unless per chance the purchase price of the particular property was competent as substantive evidence of the value of the property involved in the action, it would seem that the party asking the question should be bound by the answer. To hold otherwise would open a Pandora's box of collateral issues.

However, in this case substantially all the evidence tending to establish the purchase price of the other properties went into the record at one time or another without objection. "The admission of this evidence without objection rendered harmless the previously admitted evidence of similar import over objection." *Price v. Whisnant,* 232 N.C. 653, 62 S.E. 2d 56. Nevertheless, this evidence as to the purchase price of property, sold under threat of condemnation and not shown to be similar to the defendant's, was without probative value on the question whether plaintiff had obtained an adequate price for the land or the best bargain possible for defendant. This being true, defendant's evidence that plaintiff had told him "he did not bother to find out" at what price the Power Company had obtained other property in the community likewise does not bear upon the question.

The testimony of defendant and that of Mr. Gooch both tended to show that the price which plaintiff obtained for defendant's property was inadequate. Notwithstanding, all the evidence was that plaintiff obtained the "top dollar" which could have been obtained from the Power Company without resorting to condemnation proceedings. Plaintiff concedes that he strongly advised the defendant to accept the Power Company's offer rather than risk the delay, uncertainties, and expense incident to a condemnation proceeding. Whether, in advising settlement in preference to litigation plaintiff erred in judgment, we can never know. In any event, defendant concurred in his judgment albeit, he says, reluctantly. We must assume that as an intelligent, forty-five year old citizen with several sizeable business interests, and experience as a freelance writer, plaintiff had some familiarity with jury trials and the hazards of litigation.

The record discloses no evidence that plaintiff had at any time ever represented the Power Company or owned any stock in it. Defendant failed to prove that plaintiff had any "conflict of interest," that he acted in bad faith, or that he was guilty of any negligence which was the proximate cause of loss to him. If the evidence could be held to justify an inference that plaintiff made an error of judgment which, under the circumstances, it cannot, it still would not constitute actionable negligence.

". . . A broker is not liable for a mere mistake of judgment
that did not result from a failure to know or do that which a per-
son of ordinary prudence, under similar circumstances, would
know or do. . . . So long as the agent acts honestly, in good faith,
according to his best skill and judgment, and without negligence
in ascertaining and reporting actual facts and conditions available
to him at the time, he may not be held liable for an alleged mis-
take of judgment merely because some one is willing afterwards
to swear that a prolongation of the chaffering would have achiev-
ed greater results. The law imposes no such responsibility upon an
agent." *Smith v. Fidelity & C. Trust Co.,* 227 Ky. 120, 12 S.W.
(2d) 276, 62 A.L.R. 1353.

The plaintiff's motion to nonsuit defendant's first counterclaim
should have been allowed, and plaintiff's assignment No. 30 is sustained.

(3)　*Defendant's Second Counterclaim.*

Neither the pleadings, evidence, nor the issues brought the conten-
tions which the parties now make with reference to the second counter-
claim into sharp focus at the trial. Defendant alleged that he agreed
to purchase approximately 12.5 acres of land which the plaintiff repre-
sented to him as an entire "little mountain"; that he deposited $500.00
with plaintiff to show his good faith and to bind the trade, and in-
structed him that it should be applied on the purchase price if the title
to the property was good; that the title to a portion of the land was
not good and the 12.5 acres did not include the entire "little mountain";
that he demanded the return of his deposit which the plaintiff refused.

Defendant contends, and his evidence tended to show, that when a
survey revealed the true size and location of the 12.5 acres, which plain-
tiff had thought contained the entire mountain of seventy-five to one
hundred acres, he still agreed to buy it provided he could also obtain
the land shown on the map as an encircling road which contained ap-
proximately two acres. This brought the amount of land which defen-
dant agreed to purchase to 14.6 acres. He contends that after it was
discovered Morgan could not convey a good title to the road, he no
longer wanted the "misrepresented" hilltop without it. Thereupon, he
demanded and became entitled to the return of his deposit.

The document which plaintiff mailed defendant on October 25, 1960
with the request that he sign it as the contract between the parties,
was clearly competent to corroborate the defendant's testimony that he
was not to pay for the survey and to contradict the plaintiff even
though it was never executed.

In defense of this counterclaim, the plaintiff contends, and his evi-
dence tended to show, (1)　that it was understood between all the

parties that defendant was to pay for the survey in any event but, if he bought the property, his entire deposit of $500.00 would be credited on the purchase price; and (2)   that the deposit was made to bind defendant's contract to purchase the original 12.5 acre tract, to which the title is unquestionably good and which defendant had obligated himself to take before he attempted to buy the road, and that he forfeited the deposit when he changed his mind and reneged on the agreement. Plaintiff makes this second contention in spite of the fact that he remitted to the defendant the difference between the cost of the survey and the amount of the deposit, $49.00.

As determinative of the second counterclaim, the court, without objection from either party, submitted the following two issues, both of which the jury answered YES.

"9.   Did the plaintiff and defendant enter into a contract of purchase and sale for the Morgan land, as alleged in the answer?

"10.   If so, did the plaintiff wrongfully withhold and refuse to turn over to the defendant the $500.00 deposit, as alleged in the answer?"

In his charge the court treated the defendant's contract to purchase the 12.5 acre tract and the contract to buy the two acres included in the encircling road as one and indivisible. He charged the jury that if it found that the agreement between the plaintiff and defendant was that defendant would purchase "the Morgan lands" if the title was good, and if it were not, that he would receive back his deposit of $500.00, it would answer the ninth issue YES; otherwise NO. The judge then instructed the jury that if it answered the ninth issue YES it would answer the tenth issue YES. The last instruction was clearly both erroneous and prejudicial. It completely ignored the plaintiff's two defenses to the counterclaim. Furthermore, under the theory on which his Honor submitted the ninth issue to the jury, the instruction assumed that the title to the Morgan property was defective. Plaintiff had made no such admission and the burden was on the defendant to satisfy the jury by the greater weight of the evidence that *the title to the land he had agreed to buy* was defective. See *Improvement Co. v. Guthrie,* 116 N. C. 381, 21 S.E. 952; Annot., 169 A.L.R. 87. The credibility of defendant's evidence bearing upon this point was for the jury. There must be a new trial on the second counterclaim. This disposition of the case makes it unnecessary to consider the other numerous assignments of error.

On plaintiff's cause of action —
New trial.

On defendant's first counterclaim —
Reversed.
On defendant's second counterclaim —
New trial.